


REDACTED
COPY

**SEALED**

**FILED**

October 20, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____   **MGR**

DEPUTY

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **SA-19-CR-00788 FB** |
| **Plaintiff,** | |
| v. | **SUPERSEDING INDICTMENT** |
| **DAVID JOSEPH BOLDUC, JR., (2), RUBENS WILSON FIUZA LIMA, (4),** ████████ ████████ | [Violations: **Count One**: - 18 USC § 371 – Conspiracy; **Count Two** - 18 USC §§ 1349 and 1343 Conspiracy to Commit Wire Fraud; **Count Three** – 18 USC § 1956(h) - Conspiracy to Commit Money Laundering; **Counts Four - Six**: 41 USC §§ 2102(a) and (b), 2105(a) – Unlawful Obtaining of Bid Information; **Count Seven**: 18 USC § 1031 – Major Fraud Against the United States; Government's Notice of Forfeiture] |
| **Defendants.** | |

**THE GRAND JURY CHARGES:**

### INTRODUCTION

At all times relevant to this Superseding Indictment:

#### United States Government Agencies

1.      The United States Air Force (hereafter "Air Force") is the aerial warfare branch of the armed forces organized within the Department of the Air Force and Department of Defense within the executive branch of the United States government.  Ten major command authorities manage the Air Force, including the Air Education and Training Command headquartered at Joint Base San Antonio, Texas.

2.      The 502 Trainer Development Squadron (hereafter "Randolph Trainer Development" or "RTD"), is a part of the Air Education and Training Command located at Randolph Air Force Base, Universal City, Texas and within the Western District of Texas.  The RTD procures and maintains simulator training systems for Department of Defense agencies.  The RTD also assists with procuring simulator technology for authorized foreign militaries.

3.      The General Services Administration (hereafter "GSA") is a United States agency within the executive branch that acquires property and services for other government agencies.  The RTD uses government contracts arranged through the General Services Administration and other contracting agencies to acquire technology and service.

### Procurement Process

4.      Agencies often pay for goods and services, including those provided by RTD, using a Military Interdepartmental Purchase Request ("MIPR").  A MIPR is a method for one military organization to transfer funds to another to procure services, supplies, or equipment.

5.      GSA establishes standing contracts called "multiple award schedules" through which contractors supply categories of goods and service at prices pre-determined by GSA to be fair and reasonable.  Once a contractor receives a multiple award schedule, it is eligible to compete with other schedule holders for "orders" placed by government agencies for goods or services.  When awarding a particular order, GSA selects the schedule holder that offers the best value to the government; in other words, the lowest price among the technically acceptable schedule holders.  A schedule holder is required to certify annually that it determined the pricing of delivery orders, task orders, and modules independently and without intent to restrict competition.

6.      Contracting Officers (hereafter "CO" or "COs") are government employees authorized by law to bind the government to contracts.  COs rely on client agencies for assistance in defining

2

needed services and products; making independent estimates of contract costs for comparison to proposals and quotes; critiquing contractor proposals and quotes; defining criteria for contractor selection; choosing source selection committee members; and monitoring contractor performance, verifying contractor invoices, and recommending modifications and amendments to contracts.

7.    The client agencies typically appoint one of their employees to serve as the Contracting Officer's Representative ("COR") on individual contracts. A COR is an individual, including a Contracting Officer's Technical Representative ("COTR"), designated to perform specific technical or administrative functions. CORs do not have authority to bind the government contractually.

8.    An Independent Government Cost Estimate (hereafter "IGCE") is the government's own estimated cost or price that a contractor may incur in providing services and products to achieve the Government's objectives. The IGCE serves as a basis for reserving funds during acquisition planning; provides a basis for comparing costs or prices proposed by a potential contractor; and serves as an objective basis for determining price reasonableness in cases where multiple contractors respond to a solicitation. The IGCE, including any supporting work sheets, is confidential, and the government may not provide it or the information it contains to a potential contractor before the potential contractor prepares a proposal or while it is preparing one.

9.    The government is entitled to receive quality supplies and services at fair prices. Under normal market conditions, competing offers ensure that the government receives adequate value. The CO relies on the IGCE to assist in the determination of the acquisition strategy, as well as an estimated cost for the proposed effort.

**Defendant Seguin**

10.     Defendant Keith Alan Seguin (hereafter "**Defendant Seguin**") was a civilian government employee at the RTD authorized by the Air Force to solicit and accept orders for simulator technology and support and to promote and manage related contracts for the benefit of the United States.

11.     The RTD routinely appointed **Defendant Seguin** as the COR on contracts. By virtue of his positions as an Air Force employee and as a COR, **Defendant Seguin** was a fiduciary of the United States obligated to be honest and loyal, to safeguard Air Force property, and to disclose all facts his employer was entitled to know.

12.     Simulation Fabrication Products was an assumed name created by **Defendant Seguin** in 2007. In 2008, **Defendant Seguin** formed Simulation Products LLC, a Texas limited liability company. In 2014, **Defendant Seguin** filed an assumed name document for Simulation Products in Comal County, Texas.

13.     Epic1 Engineering Services was an assumed name created by **Defendant Seguin** in 2014. In February 2015, **Defendant Seguin** created Epic1 Engineering Service, LLC, a Texas limited liability company.

**Defendant Fiuza Lima**

14.     Defendant Rubens Wilson Fiuza Lima, (hereafter "**Defendant Fiuza Lima**") a friend of **Defendant Seguin**, resided in Georgia until 2012 when **Defendant Seguin** arranged a job for **Defendant Fiuza Lima** with a subcontractor on a RTD contract.

15.     Impex Import Export Inc. (hereafter "Impex") was a Georgia corporation formed by **Defendant Fiuza Lima** on February 12, 2010, in Cobb County, Georgia.

4

### Prime Contractors A and B

16.     Prime Contractor A, who is not a Defendant in this indictment, was a prime contractor on RTD contracts, task orders, delivery orders, and modules.  In October 2012, a multi-national corporation, (hereafter "Prime Contractor B") acquired Prime Contractor A and changed its name. Prime Contractor A and Prime Contractor B routinely subcontracted work on RTD orders to **Co-Conspirator Quantadyn**.

### Co-Conspirator Quantadyn

17.     Co-Conspirator Quantadyn Corporation (hereafter "**Co-Conspirator Quantadyn** ") was a Virginia software engineering company that worked on RTD simulator projects. **Co-Conspirator Quantadyn** was a prime contractor on smaller RTD contracts, but derived most of its revenue as a subcontractor on larger RTD contracts. From 2008 through 2013, **Co-Conspirator Quantadyn** had gross revenue of less than $4 million per year.  Beginning in 2013 and continuing through 2018, **Co-Conspirator Quantadyn**'s gross revenue grew to more than $20 million per year.

### Defendant Bolduc

18.     Defendant David Joseph Bolduc, Jr. (hereafter "**Defendant Bolduc**") was an owner and manager of **Co-Conspirator Quantadyn**.  **Defendant Bolduc** is a close friend of **Defendant Seguin**.

### Defendant ▮▮▮▮

19.     Defendant, ▮▮▮▮ ▮▮▮▮ (hereafter "**Defendant ▮▮▮**") was employed by Prime Contractor A and Prime Contractor B from August 2002 through February 2015, first as an analyst, then as a program manager.  **Defendant ▮▮▮** worked on Air Force training simulator contracts, including RTD contracts managed by **Defendant Seguin**.  **Defendant ▮▮▮** also developed, reviewed, and coordinated federal government contract proposal documentation

5

including statements of work for Prime Contractor A and Prime Contractor B. **Defendant** ██████ supervised **Defendant** ██████

**Defendant** ██████

20.     Defendant, ██████, (hereafter "**Defendant** ██████") was employed by Prime Contractor A and Prime Contractor B from March 2007 through May 2020, first as a staff analyst and then as a project and program manager. **Defendant** ██████ worked on Air Force training simulator contracts, including RTD contracts managed by **Defendant Seguin**. **Defendant** ██████ also developed, reviewed, and coordinated federal government contract proposal documentation including statements of work and Prime Contractor B pricing.

### Government Contracts

21.     The Boom Simulator contract, FA3089-07-F-0192, was a July 20, 2007, contract awarded to **Co-Conspirator Quantadyn**. Its purpose was to deliver simulators capable of training Air Force personnel in aerial refueling operations. (The "boom" is an extendable arm attached to the underside of a tanker aircraft.) After nine modifications, the contract amount was $4,300,084 and the period of performance was from December 30, 2008 until September 30, 2010.

22.     The Crew Resource Management Trainer contract (hereafter "CRMT contract") was a December 15, 2009, modification/increase of $6,374,146, by the Department of Defense to an existing delivery order contract 0204 held by Prime Contractor A. That amount included an RTD order of $1,471,630.00. The CRMT contract included flight simulator software and testing for KC-135R tanker aircraft and C-130 H2/J military transport aircraft crew resource management trainers. Prime Contractor A subcontracted the work to **Co-Conspirator Quantadyn**, per a request from **Defendant Seguin**.

6

23.     The Trainer Development IT contract (hereafter "TDIT contract") was an existing contract awarded to Prime Contractor A.  From May 2011 through June 2015, the RTD ordered $13,224,165.00 in goods and service from Prime Contractor A.  Prime Contractor A paid **Co-Conspirator Quantadyn** approximately $8 million as a subcontractor.

24.     The Trainer Development 1 contract (hereafter "TD-1 contract") was a September 17, 2013, GSA contract awarded to Prime Contractor B.  GSA awarded the $413,395,584.00 TD-1 contract/delivery order to Prime Contractor B at the request of RTD and **Defendant Seguin**.  Prime Contractor B subcontracted some of the work under the TD-1 contract to **Co-Conspirator Quantadyn**.  As of June 2019, GSA had paid $440,286,313.00 to Prime Contractor B.  As of March 2019, Prime Contractor B had paid **Co-Conspirator Quantadyn** $99,734,406.00.

25.     The Trainer Development 2 contract (hereafter "TD-2 contract") is a multiple award, indefinite delivery, indefinite quantity GSA contract to build training simulators and provide technical support and service with options for up to ten years.  TD-2 is intended to replace the TD-1 contract.  In February 2015, RTD and **Defendant Seguin** requested that GSA create a new $1.2 billion dollar contract as RTD's contracting vehicle.

### Governing Laws and Regulations

26.     The following laws and regulations governed the procurement process described above and were binding on the Defendants and on other individuals and entities that participated in the procurement process:

   a.  Title 5 C.F.R. § 2635.702 prohibits government employees from using public office for private gain;

   b.  Title 5 C.F.R. § 2635.702(a) prohibits government employees from using or permitting the use of a position or title or any authority associated with a public office

7

in a manner intended to coerce or induce another person to provide any benefit, financial or otherwise, to the employee or his friends or relatives, or persons with whom the employee was affiliated in a non-governmental capacity;

c. Title 5 C.F.R. § 2635.202 prohibits government employees from accepting gifts that are: (a) from a prohibited source; (b) given because of the employee's official position; (c) in return for being influenced in the performance of an official act; (d) from the same or different sources on a basis so frequent that a reasonable person would be led to believe the employee was using public office for private gain; or (e) in violation of any statute.

d. Title 18 U.S.C. § 201(b)(1) makes it a crime for anyone to corruptly offer, promise, or give a thing of value to a government employee with intent to influence an official act; to influence the public official to commit or facilitate in any way a fraud on the United States; or to induce the public official to violate his lawful duties;

e. Title 18 U.S.C. § 201(b)(2) makes it a crime for a government employee to corruptly seek or accept things of value that violate Section 201(b)(1) above;

f. Title 18 U.S.C. § 201(c)(1) makes it a crime for a government employee to seek or accept a thing of value for or because of an official act performed or to be performed by the employee and makes it a crime for other persons to offer, promise, or give a government employee such things of value;

g. Title 18 U.S.C. § 208(a) makes it a crime for a government employee to substantially participate in a government transaction in which the employee has a financial interest;

8

h. Title 18 U.S.C. § 641 makes it a crime for anyone to steal or convert to personal use and the use of others property, including information, belonging to the United States; and

i. Title 41 U.S.C. §§ 2102 and 2105 makes it a crime for a federal official to knowingly disclose, or another person to knowingly obtain, contractor bid or proposal information or source selection information related to a federal agency procurement contract before the award of the contract, either for a thing of value or to obtain or give a person a competitive advantage in the award.

## COUNT ONE
### [18 U.S.C. § 371]

The Introduction set out above in this Indictment is incorporated by reference in its entirety as if fully set out herein.

Beginning in or about 2006 and continuing until in or about 2018, in the Western District of Texas, and elsewhere, the Defendants,

**KEITH ALAN SEGUIN,**
**DAVID JOSEPH BOLDUC, JR.,**
**RUBENS WILSON FIUZA LIMA,**
██████████████

knowingly and willfully conspired and agreed together and with each other, and with other persons both known and unknown to the grand jury, to commit an offense against the United States and to defraud the United States of and concerning its governmental functions and rights, hereafter described, that is, they willfully conspired to:

1. defraud the United States by corrupting, impeding, and defeating the lawful governmental functions of the Air Force and GSA in the procurement of simulator training technology and service, by eliminating competition and fixing contract awards and prices on Air

Force and GSA contracts for simulator technology and service, and by depriving the United States

of the right to the honest and unbiased service and decisions of Air Force employees, contractors,

and subcontractors;

    2.        commit bribery in violation of Title 18, United States Code, Section 201(b);

    3.        cause Defendant Seguin, as an Air Force employee, to participate in Air Force and

GSA procurement decisions and recommendations while having personal financial interests in

those matters in violation of Title 18, United States Code, Section 208(a);

    4.        embezzle, steal, and knowingly convert confidential United States information and

other property of a value greater than $1000, and without authority sell and convey confidential

United States information and other property of a value greater than $1000 to conspirators who

would knowingly receive, conceal, and retain the stolen information and property in violation of

Title 18, United States Code, Section 641;

    5.        make false statements, conceal material facts, and use false writings in GSA

contracting matters in violation of Title 18, United States Code, Section 1001; and

    6.        disclose and receive confidential contractor bid and proposal information and

source selection information before the award of Federal procurement contracts in violation of

Title 41, United States Code, Sections 2102 and 2105.

### **Manner and Means**

It was part of the scheme and conspiracy that:

    1.        **Co-Conspirator Quantadyn** and **Defendant Bolduc** would and did form a corrupt

partnership with **Defendant Seguin** and would and did pay him $2.3 million in cash and other

bribes and kickbacks for $100 million in work on Air Force simulator projects.

2.      In return for the bribes and kickbacks, **Defendant Seguin**, would and did routinely barter and sell both confidential information and the authority entrusted to him by the Air Force, in violation of federal law and his fiduciary duties of honesty, loyalty, and disclosure.

3.      **Defendants Seguin**, **Bolduc**, ███ and ███ and **Co-Conspirator Quantadyn** would and did collude to eliminate competition for RTD contracts and orders, to subvert and defeat GSA contracting procedures, and to determine the winner and the price of contracts and orders.

4.      For the Boom Simulator contract, **Co-Conspirator Quantadyn**, as a prime contractor, and **Defendant Bolduc** would and did pay **Defendant Seguin**'s bribes through a subcontractor.

5.      To ensure that **Co-Conspirator Quantadyn** would continue to receive work on multi-year, multi-million dollar RTD contracts like the CRMT contract, the TDIT contract, and the TD-1 contract, from Prime Contractor A and Prime Contractor B, **Defendant Seguin** would and did corruptly steer task orders and contracts to Prime Contractor A and Prime Contractor B by, among other things:

a.      illegally divulging confidential RTD and GSA contracting information to **Defendant** ███ and **Defendant** ███, employees of those prime contractors, including but not limited to MIPRs, sensitive government information contained in the MIPRs, and government budgets;

b.      fraudulently inflating independent government cost estimates;

c.      allowing and enabling **Defendant** ███ and **Defendant** ███ employees of those prime contractors to contrive fraudulent quotes to GSA that were roughly equal to

11

the GSA/RTD budget amounts, rather than formulating honest quotes based on real labor hours, costs, and profit;

d.      allowing and enabling **Defendant** ▊▊▊ and **Defendant** ▊▊▊ employees of the prime contractors to fabricate artificial labor hours, costs, and profit to approximate the GSA/RTD budgets that **Defendant Seguin** had improperly disclosed; and

e.      Knowingly convert to the personal use and benefit of himself, **Defendants,** ▊▊▊, and ▊▊▊, employed by Prime Contractor B, **Co-Conspirator Quantadyn** and **Defendant Bolduc**, confidential GSA and RTD information and other government property, including but not limited to:

(1)     Independent government cost estimates, GSA statements of work, competitor proposals, competitor proposal evaluation forms, and evaluations of competitor proposals;

(2)     Communications between GSA COs and **Defendant Seguin** relating to proposed contracts, and orders;

(3)     Military Interdepartmental Purchase Requests (MIPRs) and sensitive government information contained in the MIPRs submitted to RTD by customer agencies purchasing simulator technology and service, including the amounts of money customers transferred to RTD and GSA for simulator procurements;

(4)     MIPRs and amounts submitted by RTD to GSA to fund simulator contracts;

(5)     RTD and GSA budgets for procurement orders and multi-year RTD budgets and projections; and

(6)     RTD spreadsheets containing the above information.

12

6. As a fee for subcontracting the work to **Co-Conspirator Quantadyn**, Prime Contractor A and Prime Contractor B would receive an agreed upon percentage of each order as a fee.

7. **Defendant Seguin** would and did demand bribes and accept bribes from **Co-Conspirator Quantadyn** and **Defendant Bolduc** commensurate with his performance in delivering RTD simulator work to **Co-Conspirator Quantadyn**.

8. **Co-Conspirator Quantadyn** and **Defendant Bolduc** would and did submit quotes and claims to the prime contractors that were inflated by **Defendant Seguin**'s bribes, at which point **Defendant**  ▆▆▆  and **Defendant**  ▆▆▆ , employees of the prime contractors, would and did incorporate **Co-Conspirator Quantadyn**'s inflated quotes and claims into the prime contractors' quotes and claims to GSA/RTD.

9. **Defendant Seguin**, as RTD program manager and as a GSA COR, would and did recommend approval of the prime contractors' proposals, quotes, claims and invoices, and would and did cause GSA to pay the claims.

10. **Defendants Seguin, Bolduc**, and **Fiuza Lima** and **Co-Conspirator QuantaDyn** would and did disguise the bribes as payments for goods and services between **Co-Conspirator Quantadyn** and sham businesses created by **Defendant Seguin** and **Defendant Fiuza Lima**.

11. **Defendants Seguin, Bolduc**, and **Fiuza Lima** and **Co-Conspirator QuantaDyn** would and did launder and hide the proceeds of the conspiracy and scheme in order to conceal the nature, location, source, ownership, and control of the bribes and proceeds of fraud.

12. **Defendant Seguin**, in matters concerning GSA/RTD contracts and orders within the jurisdiction of the GSA and the Air Force, would and did knowingly make false statements,

13

compose, and use false writings, and conceal material facts relating to his bribe taking, conflicts of interest, theft, and fraud against the United States.

13.     **Defendants Seguin, Bolduc** and ▮▮▮▮, **Co-Conspirator QuantaDyn** and others would and did knowingly attempt to convert in excess of $1 million of funding by diverting it from authorized RTD training simulator orders toward the unauthorized construction and furnishing of an office mezzanine at RTD's Randolph AFB facility.

### Overt acts

In furtherance of the conspiracy and scheme, and to effect its objects and purposes, the **Defendants** and **Co-Conspirator QuantaDyn** committed the overt acts set forth below and others:

1.     On or about May 17, 2007, **Defendant Seguin** signed a government non-disclosure agreement in connection with the Boom Simulator contract, acknowledging government restrictions on conflicts of interest as well as the prohibition against sharing source selection data.

2.     On or about July 6, 2007, **Defendant Seguin**, as a member of the source selection committee, reviewed the Boom Simulator contract proposals and rated **Co-Conspirator Quantadyn**'s proposal as "meets" and "exceeds" the requirements.

3.     On or about July 13, 2007, **Defendant Seguin** established Simulation Fabrication Products, an assumed name, in Comal County, Texas.

4.     In or around August 2007, **Defendant Seguin,** using the assumed name, Simulation Fabrication Products purportedly provided work to a subcontractor on the Boom Simulator contract.

14

5.      On or about December 10, 2007, **Defendant Seguin** opened an account for Simulation Fabrication Products at a Credit Union, located in San Antonio, Texas and deposited or caused to be deposited $9,000.00 into the new account.

6.      On or about January 26, 2008, **Defendant Seguin** deposited or caused to be deposited $31,805.44 into the Simulation Fabrication Products account at the Credit Union.

7.      On or about August 15, 2008, **Defendant Seguin** filed or caused to be filed papers forming Simulation Products, LLC, a limited liability company and listing **Defendant Seguin** as the Registered Agent.

8.      On or about March 10, 2009, **Defendant Seguin** suggested to **Defendant** ▮▮▮▮▮ that the prime contractor undertake the CRMT contract provided that it would, as the prime contractor, pass through the bulk of the contract work to **Co-Conspirator Quantadyn**.

9.      On or about December 9, 2009, **Defendant Seguin** sent an email to **Defendant** ▮▮▮▮▮, with copies to **Co-Conspirator Quantadyn**, that included the confidential IGCE and the MIPR documents related to the CRMT contract.

10.     On or about March 30, 2010, **Defendant Seguin** emailed **Defendant Fiuza Lima**, and sought his assistance to launder payments from **Co-Conspirator Quantadyn** to **Defendant Seguin**.

11.     On or about March 30, 2010, **Defendant Fiuza Lima**, through his company Impex, submitted a quote for work on the CRMT contract to **Co-Conspirator Quantadyn** and **Defendant Bolduc**.

12.     On or about July 30, 2010, **Defendant Seguin** opened or caused to be opened a checking account at a Credit Union in San Antonio, Texas in the name of Simulation Products, LLC; and on July 31, 2010, he deposited a check from Impex into the newly established account.

15

13.    On or about December 6, 2010, **Co-Conspirator Quantadyn** sent or caused to be sent a payment in the amount of $62,913.06 to **Defendant Fiuza Lima**, and his company Impex.

14.    On or about December 18, 2010, **Defendant Fiuza Lima**, using his company Impex, sent, or caused to be sent to **Defendant Seguin** and Simulation Products, LLC a check in the amount of $56,621.75.

15.    On or about January 3, 2011, **Defendant Seguin** deposited or caused to be deposited into his personal bank accounts and the Simulation Products, LLC account the sum of $56,621.75.

16.    On or about June 1, 2011, **Defendant Seguin** sent an email to **Defendant** ████ instructing him to establish a subcontract with **Defendant Quantadyn** and another subcontractor.

17.    On or about June 6, 2011, **Defendant Seguin**, using Simulation Products, LLC, sent and caused to be sent to **Co-Conspirator Quantadyn** an invoice in the amount of $102,000.00 purportedly for materials to be used on simulators as part of the TDIT-079 contract.

18.    On or about December 9, 2011, **Defendant Seguin** sent an email to **Defendant Bolduc** writing that he was increasing the amount of the payments he expected from **Co-Conspirator Quantadyn**.

19.    On or about September 24, 2012, **Defendant** ████ and **Defendant Seguin** created a sub-contract position under Prime Contractor A for **Defendant Fiuza Lima** to work at RTD on Randolph Air Force Base in support of the TDIT-215 contract.

20.    On or about October 1, 2012, **Defendant Seguin**, on behalf of Simulation Products, LLC., sent and caused to be sent an invoice in the amount of $116,000.00 for eight (8) IG Chassis to **Co-Conspirator Quantadyn** as part of TDIT-215.

21.     On or about October 29, 2012, **Co-Conspirator Quantadyn**, after approval from **Defendant Bolduc,** sent and caused to be sent a Purchase Order to Simulation Products, LLC for eight (8) IG Chassis in the amount of $116,000.00 as part of TDIT-215.

22.     On or about February 18, 2013, **Defendant Seguin** sent an email message to **Defendant Bolduc** that included the IGCE of the Air National Guard Advanced JTAC Training System (AAJTS) simulator, the subject of the proposed TD-1 Contract.

23.     On or about March 8, 2013, **Defendant Bolduc** texted **Defendant Seguin** that the AAJTS simulator is "our last chance to make money. Let's go out with a bang."

24.     On or about April 5, 2013, **Defendant** ███████ sent a message from his personal email account to **Defendant Seguin**. In the message, **Defendant** ███████ revealed he used his personal email account because he didn't want the email on company servers in order to protect himself and **Defendant Seguin**. **Defendant** ███████ then provided comments to **Defendant Seguin** about four proposals received by GSA from Small Business contractors in connection to the proposed TD-1 contract.

25.     On or about April 8, 2013, **Defendant Seguin** forwarded a message to **Defendant** ███████ personal email account. The email contained questions from a GSA employee regarding the proposed TD-1 contract's Performance Work Statement (PWS). The subject line of the email read, "Look this over."

26.     On or about April 8, 2013, **Defendant** ███████ sent a reply to **Defendant Seguin** and provided "Thoughts/comments." **Defendant** ███████ further stated he liked the focus on an "integrator."

17

27.     On or about April 9, 2013, **Defendant Seguin** submitted **Defendant** ▮▮▮ comments on the proposed TD-1 contract's Performance Work Statement (PWS) as his own to GSA. The comments were to be included in the PWS.

28.     On or about April 10, 2013, **Defendant Seguin** submitted a PDF file containing his assessment of the four Small Business contractors' proposals to GSA.  **Defendant Seguin**'s assessment included **Defendant** ▮▮▮ April 5, 2013 comments.

29.     On or about April 17, 2013, **Defendant Seguin** sent a scanned copy of GSA's proposed TD-1 contract's Performance Work Statement to **Defendant** ▮▮▮ personal email.

30.     On or about April 24, 2013, **Defendant Seguin** texted **Defendant** ▮▮▮ asking for **Defendant** ▮▮▮ personal email account so **Defendant Seguin** could send the proposed TD-1 contract's Quality Assurance Surveillance Plan (QASP) before GSA publicly solicited its request for proposal.

31.     On or about April 24, 2013, **Defendant Seguin** emailed a copy of the GSA proposed TD-1 contract's QASP to **Defendant** ▮▮▮ personal email account and requested he review it and let **Defendant Seguin** know if **Defendant Seguin** needed to make any changes.

32.     On or about April 24, 2013, **Defendant** ▮▮▮ replied to **Defendant Seguin** stating the QASP looked like what Prime Contractor B was used to seeing.

33.     On or about June 7, 2013, **Defendant** ▮▮▮ sent an email from her personal email account, to **Defendant Seguin** and asked if "she" mentioned when for sure "it" will go out. **Defendant Seguin** replied to **Defendant** ▮▮▮ that GSA wanted to get the RFP out on Monday.

34.     On or about July 3, 2013, **Defendant** ▮▮▮ emailed a copy of TD-1 Contract's Request for Proposal (RFP) and Prime Contractor B's Technical Approach from her work email account to her personal email accounts.

35.     On or about July 19, 2013, **Defendant** ███████ emailed Prime Contractor B's TD-1 proposal to a Prime Contractor B contracting officer. The email contained a Cover Letter, Technical Portion that included the Technical Approach and Past Experience (TA & PE), and the non-technical Portion (Pricing).

36.     On or about July 24, 2013, **Defendant** ████████ informed **Defendant Seguin** that the Contracting Officer (CO) got a delivery today.

37.     On or about August 12, 2013, **Defendant Seguin** signed a non-disclosure agreement and conflict-of-interest declaration form as a member of the GSA source selection team that would review proposals for the TD-1 contract.

38.     On or about August 13, 2013, **Defendant Seguin**, emailed the TD-1 contract source selection team evaluation form for Prime Contractor B to **Defendant** ██████.

39.     On or about August 13, 2013, **Defendant** ███████ sent a message to **Defendant** ████████ which stated "hey - got an email you need to look at asap...I don't mind filling it out but thought you should see it."

40.     On or about August 15, 2013, **Defendant Seguin**, emailed **Defendant** ███████ the confidential proposal submitted by a company competing for the TD-1 contract, along with a blank source selection team evaluation form.

41.     On August 16, 2013, **Defendant** ████████ forwarded the competing company's technical proposal and the Government's Source Selection Evaluation sheet to another email account.

42.     On or about August 16, 2013, **Defendant** ███████ sent a draft Subcontractor's Statement of Work to **Defendant Seguin** and stated it was what Prime Contractor B intended to give to **Co-Conspirator Quantadyn**.

19

43.     On or about August 17, 2013, **Defendant** ███ converted the files **Defendant**

**Seguin** sent on August 15, 2013, into separate PDF files and re-named them.

44.     On or about August 18, 2013, **Defendant Seguin** emailed a copy of his Technical

Evaluation document to the GSA Program Manager.

45.     On or about September 6, 2013, **Defendant Seguin** emailed **Defendant Bolduc,**

**Defendant** ███ and **Defendant** ███ the "Aliant Module Tracking Sheet.xlsx

UPDATED with costing" for the first nine modules to be awarded as part of the TD-1 contract. In

the email, **Defendant Seguin** indicated the document contained the government's available budget

for each contract module.

46.     On or about September 16, 2013, **Defendant Seguin** sent an email to **Defendant**

███ that included the IGCEs for modules 001 through 009 to the TD-1 contract.

47.     On or about September 25, 2013, **Defendant Seguin** sent an email to **Defendant**

███ discussing how much money Prime Contractor B could charge for work performed by

**Co-Conspirator Quantadyn** under the TD-1 contract.

48.     On or about October 15, 2013, **Defendant** ███ and **Defendant Seguin**

arranged to have **Defendant Fiuza Lima** and others hired as direct employees of Prime Contractor

B to support the TD-1 Contract.

49.     On or about November 8, 2013, **Defendant Seguin** sent a text message to

**Defendant** ███ concerning the pricing for the TD-1 contract modules 1, 4, 5, and 11.

50.     On November 8, 2013, **Defendant Seguin** texted **Defendant** ███ **Defendant**

**Seguin** stated "Remember in doing the pricing for 1, 4, 5, 11 we dont [sic] have any more money.

Like we talked all the current modules thru 11 have to be 5%.  And when *** [ a person known to

the Grand Jury] funds the next 7 AAJTS  All others charge what ever [sic] you need."

51.     On or about February 28, 2014, **Co-Conspirator Quantadyn** sent and caused to be sent a check to Simulation Products in the amount of $60,000.00.

52.     On or about March 10, 2014, **Defendant Seguin** deposited and caused to be deposited into a Simulation Products account at a credit union the check from **Co-Conspirator Quantadyn** in the amount of $60,000.00.

53.     On or about March 13, 2014, **Defendant Seguin** recommended approval of the TD-1 contract module 1, 4 and 5 requests for payment that Prime Contractor B had submitted to GSA.

54.     On or about October 22, 2014, **Defendant Seguin** filed or caused to be filed assumed name papers at the County Clerk's Office, in New Braunfels, Comal County, Texas for Epic1 Engineering Services.

55.     On or about October 29, 2014, **Defendant Seguin** sent a text message to **Defendant Bolduc**'s cell phone, stating among other information, "New company name. Epic1 Engineering Services."

56.     On or about November 29, 2014, **Defendant Seguin** exchanged a series of text messages with **Defendant Bolduc** regarding payments from **Co-Conspirator Quantadyn** to **Defendant Seguin**.

57.     On or about December 27, 2014, **Defendant Seguin** caused a $200,000 check, dated November 28, 2014, from **Co-Conspirator Quantadyn** and payable to Epic1 Engineering Services, to be deposited into the new Epic1 Engineering Services checking and savings account at the credit union located in San Antonio, Texas.

58.     On or about September 12, 2015, **Defendant Seguin** sent an email message to **Defendant** ▇▇▇▇ with the subject line, "Target numbers." The "target numbers" pertained to 17 upcoming TD-1 modules and said **Defendant Seguin** was working numbers for two others.

59.    On or about September 13, 2015, **Defendant** ▮▮▮ replied to **Defendant Seguin**'s email and asked questions related to the "target numbers" **Defendant Seguin** previously sent.  In the email, **Defendant** ▮▮▮ indicated another Prime Contractor B employee who worked at RTD with **Defendant Seguin,** had provided the government's sensitive budget information to **Defendant** ▮▮▮.

60.    On or about September 17, 2015, Prime Contractor B submitted its quote to GSA/RTD, for module 064. **Defendant** ▮▮▮ was listed on the proposal's cover letter as the point of contact for any technical question.

61.    On or about October 22, 2015, **Defendant Seguin** met with **Defendant** ▮▮▮, a Prime Contractor B senior executive and a business development representative for Prime Contractor B's parent company.  During the meeting, **Defendant Seguin** informed the meeting participants of a highly flexible TD-1 follow-on contract that would allow **Defendant Seguin** to continue to directly contract with **Co-Conspirator Quantadyn.**

62.    On or about October 23, 2015, **Defendant** ▮▮▮ sent an email to **Defendant Seguin** and requested he approve a $2,083,177.00 payment certification for TD-1 Contract module 061.

63.    On or about November 21, 2015, **Defendant Seguin** sent and caused to be sent an email message from Epic1 Engineering Services to **Defendant Bolduc** that included an Epic1 invoice in the amount of $59,435.00.

64.    On or about December 18, 2015, **Co-Conspirator Quantadyn** caused a check to be sent to Epic1 Engineering Services in the amount of $59,435.00.

65.     On or about January 25, 2016, **Defendant Seguin** sent an email message to **Defendant Bolduc** that contained a draft of the GSA Trainer Development 2 (TD-2) solicitation package prepared by GSA and **Defendant Seguin**.

66.     On or about January 28, 2016, **Defendant Bolduc** sent an email message to **Defendant Seguin** that included **Defendant Bolduc**'s comments about nine sections of GSA's proposed TD-2 solicitation package.

67.     On or about February 6, 2016, **Defendant Bolduc** emailed an Epic1 Engineering Services sales invoice dated March 1, 2016, in the amount of $209,746.00, to Epic1 Engineering Services.

68.     On or about February 10, 2016, **Defendant Seguin** used **Defendant Bolduc**'s comments about the proposed TD-2 solicitation package in an email message he sent to the GSA COs.

69.     On or about April 11, 2016, **Defendant Seguin** sent an email message to **Defendant Bolduc** that included the GSA solicitation proposal for TD-2, as well as three sample statements of objectives for simulator systems templates, with the message, "You know what to do."

70.     On or about September 9, 2016, **Defendant Seguin** deposited **Co-Conspirator Quantadyn**'s check, number 8136, into the Epic1 Engineering Services savings account at a credit union.

71.     On or about February 14, 2017, **Defendant Seguin** emailed spreadsheets detailing confidential Air Force budgets and how much the Air National Guard was paying for modules 9, 65, 112 and 116 in the TD-1 contract to **Co-Conspirator Quantadyn** and **Defendant Bolduc.**
All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
[18 U.S.C. §§ 1349 and 1343]

The Grand Jury re-alleges and incorporates the Introduction section of this Indictment and the Manner and Means from Count One of this Indictment herein as if fully set forth.

Beginning in or about 2006 and continuing until in or about 2018, in the Western District of Texas, and elsewhere, the Defendants,

**KEITH ALAN SEGUIN,
DAVID JOSEPH BOLDUC, JR.,
RUBENS WILSON FIUZA LIMA,**

conspired and agreed together and with others known and unknown to the grand jury to commit wire fraud. They agreed that they would knowingly devise and intended to devise a scheme and artifice to defraud the United States (including the Air Force, and the General Services Administration) and to obtain money and property from it by means of false and fraudulent pretenses, representations, and promises, as described above in the Introduction section of this Indictment and the Manner and Means from Count One and for the purpose of executing that scheme and artifice, they did transmit and cause to be transmitted in interstate commerce on or about the date listed below by means of wire communication, certain writings, signs, signals, pictures, and sounds, including but not limited to the following:

| Date | Item Sent | Interstate Transmission | By Way Of |
|------|-----------|------------------------|-----------|
| October 14, 2007 | A $105,000.00 purchase order to Simulation Fabrication Products from a technology company in Florida. | Florida to Texas | Electronic Mail |
| January 14, 2008 | Message concerning money being sent to the technology company in Florida | Texas to Florida | Electronic Mail |
| March 30, 2010 | Message containing a quote for work in the amount of $344,523.90 and a plan for laundering those funds | Texas to Georgia | Electronic Mail |

| May 9, 2010 | Invoice in the amount of $98,862.38 | Texas to Virginia | Electronic Mail |
| February 27, 2013 | Message: "you make me money and I won't mention your butt to anyone." | Virginia to Texas | Text Message |
| August 15, 2013 | Documents pertaining to a competitor's technical proposal and the source selection team's evaluation document | Texas to Ohio | Electronic Mail |
| September 24, 2013 | Message discussion concerning Prime Contractor B's fee | Texas to Ohio | Text Message |
| September 25, 2013 | Message discussion concerning Prime Contractor B's fees | Texas to Ohio | Electronic Mail |
| November 18, 2013 | Message discussion concerning Prime Contractor B's fees | Ohio to Virginia | Text Message |
| December 4, 2013 | Message discussion concerning Prime Contractor B and QuantaDyn fees | Florida to Ohio | Electronic Mail |
| September 11, 2015 | Documents pertaining to projected government funding on 19 TD-1 contract modules | Texas to Virginia | Electronic Mail |
| September 12, 2015 | Documents pertaining to projected government funding on 19 TD-1 contract modules | Texas to Ohio | Electronic Mail |
| February 5, 2016 | $209,746.00 Invoice to Epic1 Engineering Services. | Virginia to Texas | Electronic Mail |
| April 11, 2016 | Draft of GSA's proposed TD-2 | Texas to Virginia | Electronic Mail |

All in violation of Title 18, United States Code, Sections 1349 and 1343.

## COUNT THREE
[18 U.S.C. § 1956(h)]

The Grand Jury re-alleges and incorporates the Introduction in this Indictment and the Manner and Means from Count One of this Indictment herein as if fully set forth.

Beginning in or about 2006 and continuing until in or about 2018, in the Western District of Texas, and elsewhere, the Defendants,

**KEITH ALAN SEGUIN,**
**DAVID JOSEPH BOLDUC, JR.,** and
**RUBENS WILSON FIUZA LIMA,**

knowingly conspired, confederated, and agreed with each other and with other persons known and

unknown to the Grand Jury to commit the following offenses against the United States,

(a) to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, specifically, bribery in violation of Title 18, United States Code, Section 201 and wire fraud in violation of Title 18, United States Code, section 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of those proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b) to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is the deposit, withdrawal, and transfer of U.S. currency, funds, and monetary instruments, such property having been derived from a specified unlawful activity, being bribery in violation of Title 18, United States Code, Section 201 and wire fraud in violation of Title 18, United States Code, section 1343, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

### COUNTS FOUR through SIX
[41 U.S.C. §§ 2102(b) and 2105(a) and 18 U.S.C.§ 2]

The Grand Jury re-alleges and incorporates the Introduction section of this Indictment and the Manner and Means and Overt Acts from Count One of this Indictment herein as if fully set forth.

On or about the dates listed below, in the Western District of Texas and elsewhere, the Defendants,



knowingly obtained contractor bid proposal information and source selection information identified below before the award of the Federal agency procurement contract by the General Services Administration to which the information related

| Count | Date | Solicitation/Information disclosed |
|-------|------|-------------------------------------|
| Four | August 15, 2013 | Solicitation ID07130017/ Competing Company's Technical Portion (Non Price) response |
| Five | September 6, 2013 | GSA TD-1 Contract Modules 1-9 Tracking spreadsheet |
| Six | September 16, 2013 | Updated GSA TD-1 Contract Modules 1-9 Tracking spreadsheet |

All in violation of Title 41, United States Code, Sections 2102(b) and 2105(a) and 18 U.S.C. 2.

## COUNT SEVEN
[18 U.S.C. § 1031]

The Grand Jury re-alleges and incorporates the Introduction section of this Indictment and the Manner and Means and Overt Acts from Count One of this Indictment herein as if fully set forth.

Beginning in or about 2012 and continuing until on or about December 19, 2018, in the Western District of Texas, and elsewhere, the Defendants,



aiding and abetting one another and others known and unknown to the grand jury knowingly executed and attempted to execute a scheme and artifice to defraud the United States

27

and to obtain money or property by means of false and fraudulent pretenses, representations and promises in connection with a government procurement of property and services valued in excess of $1,000,000.00, that is: GSA Project Number ID07130017 and the following sub-task modules:

Module 001, awarded in the amount of $15,869,157.00;

Module 004, awarded in the amount of $1,482,884.00;

Module 005, awarded in the amount of $5,907,636.00;

Module 007, awarded in the amount of $1,961,157.00;

Module 009, awarded in the amount of $1,466,990.00;

awarded to Prime Contractor B, and it was part of the scheme and artifice to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, that the defendants engaged in the manner and means described in Count One of this Indictment, incorporated herein, and that the defendants did knowingly execute and attempt to execute the scheme and artifice with the intent to defraud the United States; and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, all in violation of Title 18, United States Code, Sections 1031 and 2.

### NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
#### [*See* Fed.R.Crim.P. 32.2]

This Notice of Demand for Forfeiture includes but is not limited to the property described in paragraphs IV-VII.

### I.
### Conspiracy Violations and Forfeiture Statutes

**[Title 18 U.S.C. § 371, subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c)]**

As a result of the criminal violations set forth in Count One, the United States of America gives notice to Defendants **KEITH ALAN SEGUIN, DAVID JOSEPH BOLDUC, JR., RUBENS WILSON FIUZA LIMA,** ██████, and ██████ of its

28

intent to seek the forfeiture of the property described below upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(1)(C) ), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

### Title 18 U.S.C. § 981. Civil forfeiture

**(a)(1)** The following property is subject to forfeiture to the United States:

* * *

**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of ... or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

### Title 28 U.S.C. § 2461.

**(c)** If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure...

**II.**

**Conspiracy to Commit Wire Fraud Violations and Forfeiture Statutes**

**[Title 18 U.S.C. §§ 1349 and 1343, subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c)]**

As a result of the criminal violations set forth in Count Two, the United States of America gives notice to Defendants **KEITH ALAN SEGUIN, DAVID JOSEPH BOLDUC, JR., RUBENS WILSON FIUZA LIMA,** ▇▇▇▇▇▇▇▇▇▇▇▇, and ▇▇▇▇▇▇▇▇▇▇▇▇ of its intent to seek the forfeiture of the property described below upon conviction pursuant to Fed. R. Crim. P. 32.2 and to Title 18 U.S.C. § 981(a)(1)(C) ), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461, which states:

### Title 18 U.S.C. § 981. Civil forfeiture

**(a)(1)** The following property is subject to forfeiture to the United States:

* * *

**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section ... or any offense constituting "specified unlawful

activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Wire Fraud is an offense constituting "specified unlawful activity" as defined in Title 18 U.S.C. § 1956(c)(7).

**Title 28 U.S.C. § 2461.**

> **(c)** If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure...

### III.
### Money Laundering Conspiracy Violations and Forfeiture Statutes

**[Title 18 U.S.C. § 1956(h) subject to forfeiture pursuant to Title 18 U.S.C. § 982(a)(1)]**

As a result of the foregoing criminal violations set forth in Count Three, the United States

of America gives notice to Defendants **KEITH ALAN SEGUIN**, **DAVID JOSEPH BOLDUC,**

**JR.**, and **RUBENS WILSON FIUZA LIMA** of its intent to seek the forfeiture of the property

described below upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 982(a)(1),

which states:

**Title 18 U.S.C. § 982.  Criminal forfeiture**

> **(a)(1)** The court, in imposing sentence on a person convicted of an offense in violation of section 1956. . . of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

### IV.
### Currency

1. $204,932.90, in funds seized from bank account xx1688 in the name of David Bolduc, Jr., held at Bank of America, N.A.;
2. $467,713.18, in funds from Merrill Lynch Cash Management account xx809;
3. $1,622,751.77, in funds from Merrill Lynch CMA/Custom Managed- Advisor account xx878;
4. $450,094.62, in funds from Merrill Lynch Cash Management account CMA/Parametric Large Core account xx887;

5. $57,818.40, in proceeds from the sale of 520 Restless Wind, Spring Branch, Comal County, Texas, title held in the name of Keith Seguin and Heliane V. Santo Seguin;

6. $304,696.58, in proceeds from the sale of 44658 Brushton Terrace, Ashburn, VA title held in the name of Keith Seguin and Heliane V. Santo Seguin;

## V.
## Vehicles

1. 2016 Honda Civic, (VIN: 19XFC2F72GE002013), seized from Keith Seguin (1); and

2. 2017 Honda Ridgeline, (VIN: 5FPYK3F84HB015312), seized from Keith Seguin (1).

## VI.
## Money Judgments

**$537,761.82,** which constitutes or is derived from proceeds traceable to the violations set forth in the Counts referenced above, and real or personal property involved in or traceable to the violations set forth in the Counts referenced above, for which **Defendant Ruben Wilson Fiuza Lima** is solely liable.

**$2,342,095.94,** which constitutes or is derived from proceeds traceable to the violations set forth in the Counts referenced above, and real or personal property involved in or traceable to the violations set forth in the Counts referenced above, for which **Defendant Keith Alan Seguin** is solely liable.

A sum of money which constitutes or is derived from proceeds traceable to the violations set forth in the Counts referenced above for which **Defendant Bolduc, Defendant** ▮▮▮▮**, and Defendant** ▮▮▮▮ is each solely liable.

## VII.
## Substitute Assets

If any of the property described above as being subject to forfeiture for the violations set forth above, as a result of any act or omission of Defendants:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property, up to the value of the money judgment, as substitute assets pursuant to Title 21 U.S.C § 853(p) and Fed. R. Crim. P. 32.2(e)(1).

A TRUE BILL.

████████████████████ _____
FOREPERSON OF THE GRAND JURY

ASHLEY C. HOFF
UNITED STATES ATTORNEY

_____
FOR WILLIAM F. LEWIS, JR.
Assistant United States Attorney

_____
FOR KELLY STEPHENSON
Assistant United States Attorney

_____
FOR JAY PORIER
Special Assistant United States Attorney